Argued March 2, affirmed March 16, 1966

# DAHL ET UX v. CLACKAMAS COUNTY, STATE LAND BOARD

412 P. 2d 364

*John C. Anicker,* Oregon City, argued the cause for appellants. On the brief were Jack, Goodwin & Anicker, Oregon City.

*Peter S. Herman,* Assistant Attorney General, Salem, argued the cause for respondent. With him on the brief was Robert Y. Thornton, Attorney General, Salem.

Before McALLISTER, Chief Justice, and PERRY, DENECKE, HOLMAN and LUSK, Justices.

DENECKE, J.

Plaintiffs brought this suit to quiet title to a piece of land in the Willamette River known as Goat Island. Plaintiffs claim ownership upon the ground that at the critical date Goat Island was situated between high and low water marks of the Willamette River. The State claims ownership upon the ground that at the critical date Goat Island was part of the bed of the Willamette River between the low water marks. The trial court found for the State.

The State owns the land between the high water marks of navigable streams. *State v. McVey,* 168 Or 337, 121 P2d 461, 123 P2d 181 (1942). The State, by statute, has conveyed its title to some of such lands. In 1874 the State granted title to the abutting owners of the land in the Willamette River between the high and low water marks. General Laws of Oregon 1874, p 76. This statute was repealed in 1878. General Laws of Oregon 1878, pp 54-55. Plaintiffs trace their title

to predecessors who were the abutting owners between 1874 and 1878.

The question is: Was the land in controversy between the high and low water marks of the Willamette River between 1874 and 1878?

■ The State has a presumption working in its favor because, "the [State's] ownership of all river beds below high water mark of all navigable streams * * * is presumed to continue until the state is shown to have parted with its title." *Freytag v. Vitas,* 213 Or 462, 469-470, 326 P2d 110 (1958).

Goat Island is located as shown on the following sketch, which is made from one of the exhibits, a map dated 1895:

The plaintiffs claim that at low water during the critical years there was no water between Goat Island and what appears from the sketch to be the north bank of the river. They further contend that the north or

righthand low water mark of the Willamette River (facing downstream) was on the south or lefthand bank of Goat Island.

In 1933 the river was dredged, and the area between the north bank of Goat Island and what from the sketch appears to be the north bank of the river was made the main channel. As a result, since 1933 Goat Island is at all times surrounded by water.

Plaintiffs called witnesses who testified to the condition of the river as early as 1905. Some of them stated that at low water there was no water between the island and the north bank. However, two of the plaintiffs' witnesses testified to the contrary. The most knowledgeable witness, a retired employee of the Corps of Engineers, who had some part in the 1933 dredging, testified that just before the dredging commenced, at low water, there was water surrounding the island.

The State introduced a sketch of this portion of the river, which was prepared by the Corps of Engineers, and which had the results of soundings reduced to "low water plane." This was dated 1889. This indicates that at low water the island was surrounded by water.

Another chart prepared by the Corps of Engineers, dated 1895, also indicates that at low water the island was surrounded by water.

Lt. Charles Wilkes surveyed the area in the years 1838-1842, and on the chart prepared by him the island is shown as surrounded by water. However, the stage of the water at the time of the survey is not known.

The trial court found that Goat Island between 1874 and 1878 was between the low water marks (i.e., part of the river's bed) and, therefore, the 1874 statute did not grant title to the abutting owners.

156

■ This suit is in equity and, therefore, is tried de novo by this court, but this court gives much weight to the findings of the trial court when there is conflicting evidence. Particularly is this so in this case when memories of conditions almost 60 years ago are the basis for some of the testimony. We commented on this in *Freytag v. Vitas,* supra (213 Or at 469).

■ We find the facts to be exactly as found by the trial court.

Plaintiffs also contend that even if there were water between the island and the north bank at low water, this was the Clackamas and not the Willamette River. There was testimony that the water at this point actually did come out of the Clackamas. The trial court found the area was in the Willamette River.

Even if the plaintiffs were able to show that this was the Clackamas River, this may not be sufficient to put title in them. However, we find that this area was in the Willamette River.

Lt. Wilkes in a written report of his expedition put this area in the Willamette River at the mouth of the Clackamas River. The two charts show it in the Willamette, as is shown by the sketch herein.

■ The source of the water flowing in the area is not the test to determine river boundaries. The most authoritative text found states:

"* * * The problem of defining the actual limits of a body of water tributary to a larger body is not always a simple one. The solution lies in finding the exact place where the tributary waterway merges into the principal waterway. In the absence of established criteria regarding the limits of a specific body of water, a basic consideration is the physical configuration of the tributary waterway at its terminus. The headland principle is based on this consideration and has been applied

internationally for ascertaining the limits of inland waters.  *  *  *" 1 Shalowitz, Shore and Sea Boundaries, at 63 (Pub 10-1, US Dept of Commerce 1962).

The headland principle was stated to be the law by Mr. Justice Field in his concurring opinion in *Knight v. United States Land Association,* 142 US 161, 12 S Ct 258, 35 L ed 974, 990 (1891). The issue in that case was the boundary between the bay and a river which entered the bay. It was said that the boundary line was a line drawn from headland to headland of the river, i.e., a line based upon the physical configuration at the mouth of the river.[①] From the physical configuration as shown on the sketch, it seems apparent that the Clackamas River terminates into the Willamette River southeast of the area here in issue, and that the area in issue is in the Willamette River.

Affirmed.

---

[①] To term the low banks existing at the confluence of the Clackamas and Willamette Rivers "headlands" would be a euphemism. However, it probably is no more so than when the term was used by Mr. Justice Field. He termed "headlands" some point in the marshes at the entrance of Mission Creek into San Francisco Bay at what is now part of the City of San Francisco.

"*  *  * In common usage, the word headland implies a land mass having considerable elevation, something that the navigator can see from offshore—a kind of landmark for him. However, in the context of the law of the sea, elevation is not a pertinent attribute. What is important are the relationships between land and water which lie in a horizontal plane. A headland can then be defined generally as the apex of a salient of the coast; the point of maximum extension of a portion of the land into the water; or a point on the shore at which there is an appreciable change in direction of the general trend of the coast. 1 Shalowitz, Shore and Sea Boundaries, supra, at 63-64.